**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
PARKERSBURG DIVISION**

UNITED STATES OF AMERICA

v.                                              CRIMINAL  ACTION  NO. 6:08-00207

MATEO DIEGO TOLEDO

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the Motion to Suppress of Defendant Mateo Diego Toledo (doc. 16).  For the following reasons, the Court **GRANTS** the motion.

**I. FACTS**

On August 22, 2008, Lieutenant Thomas Smith of the Wood County Sheriff's Office (Sheriff's Office) received information that his niece's boyfriend, Defendant Mateo Diego Toledo, was traveling to Parkersburg, West Virginia.  The purpose of this trip was to attend the birthday party of Lt. Smith's father (the grandfather of Lt. Smith's niece).  Lt. Smith believed that Defendant was an illegal alien.  He therefore contacted Immigration and Customs Enforcement (ICE) and provided that office with Defendant's date of birth, social security number, and name.  Later that day, Lt. Smith received a call from ICE Agent Edwin DeQuiros.  According to Lt. Smith, Agent DeQuiros notified him that "if we get [Defendant], take him into custody, they would take him." T. 5.  Agent DeQuiros remembers this phone call somewhat differently.  He states that after obtaining a match for Defendant's information in the ICE database, he called Lt. Smith and told him: "[I]f you encounter this individual, give me a call, and once we–I verified that this individual is the one that I have run, then I will take him into custody." T. 51. Agent DeQuiros further states that

he did not "tell [Lt. Smith] to arrest [Defendant] because they have no authority to enforce the administrative side of the Immigration and Nationality Act." *Id.* He says he told Lt. Smith: "[T]here is an administrative warrant, but you cannot enforce that." T. 52.

After this conversation, Lt. Smith traveled to his father's house to confirm the description and license plate number of the van in which Defendant and Lt. Smith's niece were traveling. At this time, he called Sergeant Westfall at his residence with this information. He also "asked [Sgt. Westfall] to go pick [Defendant] up at a local hotel" the next morning. T. 7. Sgt. Westfall then called the ICE office in Vermont multiple times to verify Defendant's status as an illegal alien. Sgt. Westfall testified that ICE told him "that they could fax [him] something to detain [Defendant]." T. 12.

Early the next morning, prior to going to the hotel where Defendant was staying, Sgt. Westfall called the dispatch office, which informed him that a fax had been received from ICE. The dispatch office in turn faxed the fax to Sgt. Westfall's office. Regarding the fax, Sgt. Westfall stated:

> I don't know how to describe it, other than a sheet of paper that–three pages, describing that Mr. Toledo was, in fact, not supposed to be in this country, from the way I read it; that he had a prior aggravated felony drug charge, I don't know the exact wording; and that if contact was made, to notify their office.

T. 13.

As it turned out, the ICE fax was Defendant's National Crime Information Center (NCIC) report. Aside from listing various personal information of Defendant, it stated:

-2-

THIS IS NOT A GOVERNMENT DETAINER[][1] THIS INFORMATION IS FOR LAW ENFORCEMENT USE AND IS BEING PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THIS RESPONSE IS NOT SUPPORTED BY FINGERPRINTS.

I.C.E. RECORDS INDICATE THAT THIS SUBJECT WAS REMOVED FROM THE UNITED STATES. NO RECORD OF A LEGAL RE-ENTRY HAS BEEN FOUND.

IMPORTANT NOTICE

THIS PERSON MAY BE AMENABLE TO ARREST FOR VIOLATION OF THE FEDERAL CRIMINAL STATUTES AND/OR FOR IMMIGRATION ACT VIOLATIONS.

IMPORTANT NOTICE

IT APPEARS THAT THIS PERSON HAS CONVICTIONS WHICH COULD BE CLASSIFIED AS AGGRAVATED FELONIES. AS SUCH, THIS PERSON MAY BE AMENABLE TO ARREST FOR IMMIGRATION VIOLATIONS.

*Government Ex. 1* (doc. 39-2).

The Government asked Sgt. Westfall at the hearing on this matter whether he believed this document was an arrest warrant. Sgt. Westfall responded: "I assumed that it meant if I found him, to take him into custody." T. 15. Sgt. Westfall made this assumption because the method through which he received the NCIC report was "how [he] received warrants from other agencies." *Id.*

Next, Sgt. Westfall proceeded to the hotel. Deputy Sheriff Leland Jefferson and a reserve deputy accompanied him. The three obtained the number of the room where Defendant and his girlfriend were staying from the clerk. Sgt. Westfall then placed a call to the room. An Hispanic man answered. After confirming that Defendant had a silver van with Nebraska license plates, Sgt.

---

[1]This sentence may have concluded with a punctuation mark. Defendant represents that it did. However, the report in the record is unclear.

Westfall told the man "[s]omeone broke into your van and took all your stuff." T. 17. Sgt. Westfall testified that this statement was untrue, but that he had engaged in the deception in the hope that Defendant would "step outside the room or come to the door of the room so that [Sgt. Westfall] could apprehend him and make sure that [Defendant] was not armed." T. 18.

Sgt. Westfall and Deputy Sheriff Jefferson proceeded quickly to the room, while the reserve deputy stayed behind them. Sgt. Westfall saw that the door was closed. He then drew his weapon and placed it in a ready-to-fire position. At that time, Defendant's girlfriend opened the door and Sgt. Westfall "looked through the doorway." T. 19. He saw an Hispanic man getting dressed and asked, "Toledo?" *Id.* The man responded, "Si"–Spanish for "yes"–and placed his hands in the air. *Id.* Sgt. Westfall then entered the room and repeated, "Mateo Toledo?" *Id.* Defendant again responded, "Si." *Id.* Sgt. Westfall handcuffed him and said, "I guess that does away with any fake passport or fake ID," to which Defendant again responded, "Si." *Id.*

Defendant was then taken to the Wood County Sheriff's Department. After processing there, he was moved to the Wood County Holding Center. The Sheriff's Office then contacted the ICE office in Charleston. ICE stated that it would take Defendant, but it could not come to Parkersburg to get him. Accordingly, Deputy Sheriff Jefferson transported Defendant to Charleston, where ICE then took custody of Defendant.

Once in ICE custody, Defendant was "processed . . . on administrative deportation" by Agent DeQuiros. T. 53. Agent DeQuiros "reinstate[d] the prior order of removal." *Id.* He also took from Defendant an "administrative sworn statement for the purpose of the reinstatement." T. 54. The statement included Defendant's name and various personal information, including the last time he was deported from the United States. Agent DeQuiros testified that "this statement is only used for

administrative proceedings and it's not for any criminal proceedings at all." T. 55.  For this reason, no Miranda warnings are given.  Agent DeQuiros further testified that, at the time that Defendant gave the statement, he was not free to leave but nonetheless gave the statement voluntarily.  Defendant was also subjected to routine fingerprinting.

Agent DeQuiros also testified regarding Defendant's "warrant for arrest of an alien," dated February 2, 2005. T. 59.  He explained: "In a reinstatement proceeding or reinstatement deportation, whatever is in the file of an alien who had been previously deported can be reinstated.  The final order of arrest can be reinstated; the warrant of arrest can be reinstated." T. 59-60.  Agent DeQuiros noted that this particular warrant appeared unserved, although he had not seen the warrant at the time of processing Defendant because he only later obtained his immigration file.  After completing his portion of the processing, Agent DeQuiros turned over Defendant's temporary immigration file, including his sworn statement and fingerprinting, to the ICE Detention and Removal Office.  This office completes deportation processing.  Agent DeQuiros did not pursue criminal charges against Defendant.  However, he also testified that he knew that the Detention and Removal Office does so in 99 percent of such cases, and that he "had only more week in the investigation office, so [he] was not going to put [Defendant] in criminal prosecution." T. 67.  Therefore, he "turned over the file to the detention and removal unit, [whose] officers also are authorized to conduct or file criminal charges against an individual." *Id.*

Agent Crystal Beveridge of the Detention and Removal Office took Defendant's file on September 2, 2008.  It was decided at this time that Defendant would be criminally prosecuted.  To this end, Agent Beveridge took a sworn Mirandized statement from Defendant, which was reduced to writing, signed by Defendant, and stamped with his fingerprint.  She then contacted the United

States Attorney's Office to ask if that office would like to accept the case.  Defendant was then transported back to the local jail, and later that day presented before a magistrate and charged with being present in the United States after prior removal for an aggravated felony, in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2).  He was then returned once again to the local jail.

Upon the Government's motion, the original complaint was dismissed and a new complaint was filed.  The new complaint removed the charge that the prior felony had been "aggravated." Defendant was indicted on this substituted complaint on September 30, 2008.

## II.  DISCUSSION

Defendant's motion asks the Court to suppress all evidence resulting from the arrest described above.  The Government responds that they do not seek to offer any statements made by Defendant to Agent DeQuiros.  However, they contend that the fingerprinting of Defendant by Agent DeQuiros and Defendant's statement to Agent Beveridge should be admitted.

### A. Fingerprints

#### 1. "Good Faith" Reliance on Invalid Warrant[2]

The Fourth Amendment protects Defendant "against unreasonable searches and seizures." U.S. CONST. amend. IV.  The Government has not contended that the Sheriff's Office complied with the Fourth Amendment when they entered Defendant's hotel room, without consent, exigent circumstances, or a warrant that they had the legal authority to enforce, and arrested him there.

---

[2]The Court makes no determination as to the validity of the administrative warrant at the time of Defendant's arrest, other than to say that if the Sheriff's Office lacked authority to enforce the warrant, it was invalid insofar as their attempted enforcement is concerned.

"Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations." *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). Moreover, "Courts will also suppress evidence that is the indirect product of the illegal police activity as 'fruit of the poisonous tree.'" *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Ultimately, "the critical inquiry is 'whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Such taint may be purged through law enforcement's "good faith" reliance on an invalid warrant: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Herring v. United States*, 129 S. Ct. 695, 701 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The reason for this exception to the exclusionary rule is that, when police reasonably but mistakenly believe they are enforcing a valid warrant, "'there [is] no basis for believing that application of the exclusionary rule . . .' would have any significant effect in deterring errors." *Id.* (quoting *Arizona v. Evans*, 514 U.S. 1, 15 (1995)).

In seeking to invoke the "good faith" rule, the Government asks the Court to consider *Herring*. In that case, the defendant had driven to the county sheriff's department to retrieve something from his impounded vehicle. *Id.* at 698. An investigator at the department suspected that the defendant might have an outstanding warrant based on his prior contact with the criminal justice system. *Id.* After first verifying that the defendant had no outstanding warrants in that county, he

had a clerk at the department call the sheriff's department in a neighboring county and ask if the defendant had any outstanding warrants there. *Id.* Her counterpart there told her that the defendant indeed had an active arrest warrant in their county. *Id.* The clerk requested that the second sheriff's department fax her a copy of the warrant. *Id.* In the meantime, she advised the investigator of the defendant's warrant. *Id.* Armed with this information, the investigator arrested the defendant and, during the search incident to arrest, found illegal drugs and an illegally possessed handgun. *Id.*

Within a few minutes of the defendant's arrest, the clerk received a call from the clerk with whom she had spoken at the other sheriff's department. *Id.* The second clerk had informed the first that the defendant had an active arrest warrant because computer records indicated that that was the case. *Id.* Normally, the sheriff's department computer records were accurate and reflected the contents of a person's physical file. *Id.* However, in this instance, when the clerk attempted to retrieve a copy of the defendant's warrant so that she could fax a copy to the neighboring county's sheriff's department, she learned from his physical file that the warrant had been recalled several months earlier. *Id.* For reasons unclear, this information had not been entered into the computer system. *Id.* She immediately called the clerk that had requested the copy of the warrant to alert her to this mixup. *Id.* The requesting clerk then radioed the investigator. *Id.* Although all of these events occurred within a maximum span of fifteen minutes, the mistake had been discovered too late. *Id.* The defendant had already been arrested and searched on what turned out to be an invalid warrant. *Id.*

The case against the defendant proceeded, and he filed a motion to suppress the drugs and gun on the ground that his arrest was illegal. *Id.* at 699. The magistrate judge recommended that the motion be denied because the investigator had acted in good faith reliance on his belief that there

was a legally enforceable warrant. *Id.* The district court adopted this recommendation and the Court of Appeals for the Eleventh Circuit affirmed. *Id.*

The Supreme Court in turn affirmed the Court of Appeals. *Id.* at 704. The Court reasoned: "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct. . . . '[A]n assessment of the flagrancy of the police misconduct constitutes an important step in the calculus of applying the exclusionary rule.'" *Id.* at 701 (quoting *Leon*, 468 U.S. at 911). Continuing, the Court explained: "'Evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Id.* at 701 (quoting *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987)). Turning to the facts before it, the Court determined that the evidence at issue should not be suppressed:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not arise to that level.

*Id.*

In the case of Defendant, however, this Court believes the exclusionary rule should apply because law enforcement's error was considerably more egregious than in *Herring.* In *Herring*, the arresting investigator was informed by a sheriff's department employee, relaying information provided by an employee of the neighboring sheriff's department, that the defendant had an unserved warrant. The arresting investigator correctly understood that a warrant for the defendant's arrest had been issued by a judicial officer. In this case, it is not clear that Lt. Smith even claims that

he received similar information about Defendant.  At the suppression hearing, Lt. Smith testified that when Agent DeQuiros returned his call, Agent DeQuiros told him "they was definitely interested in him–definitely interested in him and they would take him into custody; if we get him, take him into custody, they would get him."  T. 5.  This testimony is susceptible to two interpretations.  First, Lt. Smith may have meant that he understood that Agent DeQuiros was directing him to "take him [Defendant] into custody."[3]  The other interpretation is that Lt. Smith meant to clarify his use of the phrase "get him": "if we get him, [that is,] take him into custody, they would get him."  T. 5.  Under this latter interpretation, Agent DeQuiros never directed Lt. Smith to arrest Defendant.  He merely advised him that if the Sheriff's Office happened to "get" Defendant, presumably pursuant to a valid arrest, that ICE would take custody of him.

In any event, to the extent that Lt. Smith claimed he acted at Agent DeQuiros's direction, Agent DeQuiros directly contradicted this claim.  He testified: "I . . . told [Lt.] Smith that if you encounter this individual give me a call, and once we–I verified that this individual is the one that I have run, then I will take him into custody."  T. 51.  Specifically asked whether he had asked Lt. Smith that Defendant be arrested, Agent DeQuiros responded: "No, I never told–all the local enforcement officer[s], we don't tell them to arrest an alien because they have no authority to enforce the administrative side of the Immigration and Neutrality Act."  *Id.*  Agent DeQuiros acknowledges telling Lt. Smith "that, yeah, there's probably–there's an administrative warrant in the file, but, like I said, they cannot enforce that."  *Id.*  He testified that he explicitly told Lt Smith "you cannot enforce that."  T. 52.

---

[3]It bears noting that Lt. Smith never purported to be repeating precisely what Agent DeQuiros had said to him.

-10-

The Court finds Agent DeQuiros's testimony more credible than Lt. Smith's for several reasons. Prior to his retirement, Agent DeQuiros had worked with ICE for five years. T. 47. He had worked for the Immigration and Naturalization Service for another fifteen years. *Id.* In these capacities, he had participated in the arrests of illegal aliens "many, many times." *Id.* He testified to an office policy of not telling local law enforcement officers to arrest illegal aliens. T. 51. He further testified that he told Lt. Smith that if his office encountered Defendant, they should contact Agent DeQuiros, who would then handle the arrest because local law enforcement lacked the authority to do so. T. 51-52.

This testimony should be contrasted with that of Lt. Smith. With thirty-one and a half years experience with the Wood County Sheriff's Department, Lt. Smith is undoubtedly an experienced law enforcement officer. T. 3. However, he apparently has never had training in enforcement of immigration matters. T. 8. Moreover, when asked about his duty assignments throughout his career in law enforcement, Lt. Smith testified to working in a variety of areas. T. 3. Notably, none of these involved immigration matters.

Further, Lt. Smith acknowledged that he did not have an arrest warrant when he directed Sgt. Westfall to arrest Defendant. T. 8. In fact, he had no document whatsoever from ICE. Lt. Smith acted solely on his understanding of his conversation with Agent DeQuiros, but Agent DeQuiros states that he did not tell Lt. Smith to arrest Defendant, and that, in fact, he told him the exact opposite: do not arrest Defendant because local law enforcement lacked the authority. The Court believes that in light of the wide gap in experience between these two men in terms of immigration enforcement, it is much more likely that Agent DeQuiros's understanding of the conversation more closely approximates its substance. Agent DeQuiros testified that it was ICE policy not to advise

local law enforcement to arrest illegal aliens on administrative warrants, and there is no evidence,

beyond Lt. Smith's testimony, to indicate that this policy was not followed here.

The morning of the arrest, Sgt. Westfall received a faxed NCIC report from ICE.  T. 12.  This

document was sent in response to his request that ICE send him "something to detain" Defendant.

*Id.*  At ths suppression hearing, Sgt. Westfall volunteered that he did not know how to describe the

document.  T. 13.  He stated that the document advised him "that if contact was made, to notify their

office."  *Id.*  He stated that he did not believe that the document was an arrest warrant, but he

nonetheless interpreted it to mean that "if [he] found [Defendant], to take him into custody."  T. 15.

Sgt. Westfall based this assumption on the fact that he had received this document over the same

teletype system through which he received warrants from other agencies.  *Id.*

Sgt. Westfall testified that he took the document "at face value."  T. 14.  However, a more

careful reading of the document should have alerted Sgt. Westfall to several deficiencies with the

document.  Sgt. Westfall stated that the document was sent at his request for a detainer, but the

document explicitly said: "THIS IS NOT A GOVERNMENT DETAINER."  *Government Ex. 1*

(doc. 39-2).  (This statement may have been punctuated with an exclamation mark.)  It also advised:

"THIS INFORMATION . . . IS BEING PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THIS RESPONSE IS NOT SUPPORTED BY FINGERPRINTS."  *Id.*  Finally, the document, which

turned out to be only an NCIC report, was very indefinite: "THIS PERSON *MAY* BE AMENABLE

TO ARREST FOR VIOLATION OF THE FEDERAL CRIMINAL STATUTES AND/OR

IMMIGRATION ACT VIOLATIONS[]" and "IT *APPEARS* THAT THIS PERSON HAS

CONVICTIONS WHICH *COULD* BE CLASSIFIED AS AGGRAVATE FELONIES.  AS SUCH,

THIS PERSON *MAY* BE AMENABLE TO ARREST FOR IMMIGRATION VIOLATIONS."  *Id.*

-12-

(emphasis added).  Sgt. Westfall testified to routinely obtaining NCIC reports on people, and that the usual practice when a report showed a warrant for someone's arrest was to call the issuing jurisdiction and to ensure that the warrant remained outstanding.   T. 22.   Despite the clear shortcomings inherent in the report, which did not even show a warrant, Sgt. Westfall did not contact ICE for clarification.  He did not contact his superior, Lt. Smith, to ask if the arrest should go forward.  Instead, he drove to Defendant's hotel, engaged in a ruse to have Defendant's girlfriend open the door to their room, entered it without consent when she did so, and arrested Defendant inside.

As stated, this Court must be guided by an analysis of the ability to deter Fourth Amendment violations and the culpability of law enforcement officers.  This analysis is "objective, not an inquiry into the subjective awareness of arresting officers." *Herring*, 129 S. Ct. at 703.  Here, "'a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Id.* (quoting *Leon*, 468 U.S. at 922 n.23.))  The actions of Lt. Smith and Sgt. Westfall are a far cry from those of the sheriff's department personnel in *Herring*.  In this case, there was no warrant that gave these officers authority to arrest Defendant; rather, they presumed such authority despite receiving contrary information.  They were not merely negligent, but rather "reckless[] or grossly negligent." *Id.* at 702.  Such conduct can, and should be, deterred.  To this end, the Court' rejects the Government's argument that this case involved good faith, mistaken but objectively reasonable, reliance on an invalid warrant.

### 2. Criminal Versus Administrative Purpose

The Government argues that Agent DeQuiros fingerprinted Defendant for the purpose of "confirm[ing] his identity for deportation proceedings." *Government's Post-Hearing Response*, at p. 12. Accordingly, the fingerprint evidence "'was obtained for and motivated by an administrative purpose,'" and it should therefore escape suppression under *United States v. Oscar-Torres*. *Id.* at p. 11 (quoting *Oscar-Torres*, 507 F.3d at 232). However, as explained below, the Government's argument fails to sustain its position.

In *Oscar-Torres*, ICE was in the process of conducting a nationwide enforcement initiative aimed at illegal alien members of street gangs. 507 F.3d at 226. ICE agents and local police visited a housing project believed to be the residence of several suspected illegal alien gang members. *Id.* One group of agents and officers positioned itself at the entrance to the project. *Id.* They stopped and questioned the occupants of all vehicles entering or exiting the project, including the defendant. *Id.* The defendant admitted to being an illegal alien. *Id.* He also lifted his shirt to display any tattoos, after law enforcement asked that he do so. *Id.* The group of agents and officers then saw a tattoo that they believed signified gang membership. *Id.* At this point, they arrested the defendant and transported him to ICE headquarters. *Id.* There he was fingerprinted, photographed, and interrogated. *Id.* His statements and fingerprints were used to discover his criminal record and prior deportation. *Id.* Law enforcement did not have a warrant, and they did not give the defendant his *Miranda* warnings until seven hours after his arrest, after he had been interrogated and fingerprinted. *Id.*

The defendant was charged with violations of 8 U.S.C. §§ 1326(a) and 1326(b)(1), the same crimes with which Defendant is charged. *Id.* The defendant filed a motion to suppress all evidence

pertaining to the discovery of his unlawful presence in the country, as Defendant has in this case. *Id.* Also, as in this case, the Government in *Oscar-Torres* agreed not to present the statements made by the defendant to the ICE agents as part of its case-in-chief; however, it argued that "it should be permitted to use [the defendant's] fingerprints and the records obtained from them," notwithstanding the unlawful arrest.   *Id.*   The district court agreed with the Government, reasoning that the fingerprints and records constituted evidence of identity, which the judge believed never to be suppressible.  *Id.* at 227.

On appeal, the Fourth Circuit Court of Appeals found that illegally obtained identity evidence could be suppressed.  *Id.* at 230.  However, it also found that such evidence is "not *automatically* suppressible."  *Id.* (emphasis added).  "Rather, this evidence is suppressible only if obtained by 'exploitation' of the initial police illegality."  *Id.* (quoting *Wong Sun*, 371 U.S. at 488). The court then articulated a test for determining when "exploitation" has occurred:

> When police officers use an illegal arrest as an investigatory device in a criminal case for the purpose of obtaining fingerprints without a warrant or probable cause, then the fingerprints are inadmissible under the exclusionary rule as fruit of the illegal detention.  But when fingerprints are administratively taken . . . for the purpose of simply ascertaining . . . the identity or immigration status of the person arrested, they are sufficiently unrelated to the unlawful arrest that they are not suppressible.   Thus, fingerprints do constitute suppressible fruit of an unlawful arrest or detention unless the unlawful arrest was purposefully exploited in order to develop critical evidence of criminal conduct to be used against [the d]efendant in a criminal proceeding.

*Id.* at 230-31. (internal citations and quotations omitted).

The court also considered the possibility that in some cases fingerprinting might have a dual purpose, both investigatory and administrative.  Unlawfully obtained fingerprints may escape suppression only when they are obtained "as part of an arrest intended to lead *only* to an

-15-

administrative deportation." *Id.* at 231 (emphasis added).  However, in cases in which fingerprinting

was motivated by a dual purpose, the fingerprints must be excluded: "Of course, . . . when law

enforcement officers 'intend[] or expect[] that an arrest will lead to a criminal prosecution as well

as (or instead of) a deportation proceeding, then the 'exclusionary rule . . . continue[s] to apply' and

the fingerprints must be suppressed."  *Id.* (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1042-

43(1984)).   The court reasoned that "an alien's fingerprints taken as part of routine booking

procedures but intended to provide evidence for a criminal prosecution are still *motivated* by an

investigative, rather than an administrative, purpose.  Such fingerprints are, accordingly, subject to

exclusion."  *Id.* at 232 (emphasis in original).

> The court acknowledged that:

> > If prior to fingerprinting an alien has admitted to his unlawful
> > presence in this country (as [the defendant] did [in *Oscar-Torres* and
> > as Defendant did in this case[4]]), then the Government *may* have no
> > need or desire to investigate him for criminal activity, and the
> > Government *might* simply take his fingerprints as part of the routine
> > procedure to process him administratively for deportation.

*Id.* at 231 (emphasis added).  Clearly, however, the court did not find the defendant's preceding

admission to be dispositive, because it still remanded the case to the district court to determine

whether the evidence had been obtained for and motivated by an investigatory or administrative

purpose.  *Id.* at 232.  In so doing, the court reiterated that the fingerprints must have been obtained

*wholly* for an administrative purpose if they were to escape the defendant's motion to suppress: "We

recognize that the [district] court may conclude that both investigative and administrative purposes

---

[4]In Defendant's sworn statement to Agent DeQuiros, he admitted entering the country
illegally.  *See Government's Ex. 3* (doc. 93-4).  This statement preceded his fingerprinting by Agent
DeQuiros, which the Government now seeks to admit.  The Government does not contest
suppression of the sworn statement.

motivated the illegal arrest and fingerprinting, in which case the fingerprint[s] and attendant record evidence must be suppressed." *Id.*

This Court believes that *Oscar-Torres* counsels in favor of suppression of Defendant's fingerprints.  The arrest and fingerprinting of Defendant were motivated to investigate him for a crime, at least in part.  When Sgt. Westfall was asked on cross-examination whether he had arrested Defendant for a crime, he replied, "Yes, sir; . . . [For] [b]eing an illegal alien."  T. 29.

The Court cannot permit the Government to ignore the  investigatory purpose behind Defendant's arrest and fingerprinting, just because it may not have been law enforcement's *sole* purpose.  Here, "law enforcement officers 'intend[ed] or expect[ed]' that [Defendant's] arrest [would] lead to a criminal prosecution as well as . . . a deportation proceeding," as evidenced by Agent DeQuiros's testimony that 99 percent of such cases are prosecuted criminally and that he was not aiding in the preparation of the criminal case only because he was retiring.  *Oscar-Torres*, 507 F.3d at 231 (quoting *Lopez-Mendoza*, 468 U.S. at 1042-43).  As the *Oscar-Torres* court observed, "an alien's fingerprints taken as part of routine booking procedures but intended to provide evidence for a criminal prosecution are still *motivated* by an investigative, rather than an administrative purpose."  *Id.* at 232 (emphasis in original).  This case is not one in which "the Government . . . [had] no need or desire to investigate [Defendant] for criminal activity."  *Oscar-Torres*, 507 F.3d at 231.  His criminal prosecution is not "unanticipated and unforeseen," and thus immune from the deterrent value of suppression.  *Id.*  To the contrary, since the time of Defendant's arrest, his prosecution has been a 99 percent certainty.  Defendant was arrested and fingerprinted for a purpose that was at least partially to investigate him for a crime, the crime of unlawfully

-17-

reentering the United States after deportation as an aggravated felon.  Under the framework set forth in *Oscar-Torres*, his fingerprints must be suppressed.

### 3. Social Cost of Suppression Versus Deterrence Benefits of Admission

Finally, in regards to Defendant's fingerprints, the Government argues that they should not be suppressed because "the social cost of suppression is heavy and the deterrence benefits are minimal."  *Government's Post-Hearing Response*, at p. 14.  In support of its claim, the Government relies almost entirely on a recent case from the Eleventh Circuit Court of Appeals, *United States v. Farias-Gonzalez*, 556 F.3d 1181 (11th Cir. 2009).  In *Farias-Gonzalez*, the defendant, an illegal alien, was subjected to an unlawful search and subsequently charged with violating 8 U.S.C. § 1326. *Id.* at 1183-84.  He filed a motion to suppress all evidence found as the result of the search, including evidence of his identity, such as his fingerprints.  *Id.* at 1183.  The district court found that identity evidence is not subject to suppression.  *Id*. at 1184.  In affirming the district court, the court of appeals applied the cost-benefit balancing test articulated in *Hudson v. Michigan*, 547 U.S. 586 (2006).  In that case, dealing with a violation of the knock-and-announce rule, the Supreme Court stated that the exclusionary rule is "applicable only where its remedial objectives are most efficaciously served–that is, where its deterrence benefits outweigh its substantial social costs."  *Id.* at 591 (internal quotations omitted).[5]

---

[5]In fact, the deterrence benefits here are clear and the social costs are minimal.  Given congressionally mandated restrictions on which law enforcement officers may execute administrative arrest warrants and the superior role of ICE in these immigration matters, courts should make certain that officers observe the limits of their authority.  Suppression of Defendant's fingerprints will further this objective.  Morever, since Defendant is still subject to deportation, the social cost of enforcing this policy is minimal.

In applying the test to the facts before it, the *Farias-Gonzalez* court found that "the social costs of excluding evidence in this case are great, while the deterrence benefits are minimal." *Farias-Gonzalez*, 556 F.3d at 1189.  Addressing the social costs of exclusion, the court reasoned: "Both the court and the Government are entitled to know who the defendant is, since permitting a defendant to hide who he is would undermine the administration of the criminal justice system." *Id.* at 1188.  Moreover, the court believed that "allowing a criminal defendant to use the exclusionary rule to exclude evidence of his identity achieves the same result as would allowing him to suppress the court's jurisdiction over him," in violation of the Supreme Court's holding in *Lopez-Mendoza*.[6]  *Id.*  The court compared these costs to what it believed to be the minimal deterrence value in suppression.  It stated that "there is no evidence at issue here which could not otherwise be obtained without violating the Fourth Amendment," and even if the defendant prevailed on his motion, the Government could "collect new, admissible evidence of identity and re-indict him."  *Id.* Concluding its analysis of the deterrence benefits of suppression, the court opined that "civil suits provide deterrence for searches and seizures that violate the Fourth Amendment."  *Id.* at 1189. Ultimately, the court held "that the exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution."  *Id.*

The Court cannot accept this proposition because it is irreconcilable with *Oscar-Torres* (a Fourth Circuit case), as well as least two Supreme Court cases.  In *Oscar-Torres*, the district court had denied the defendant's motion to suppress on the grounds that identity evidence, such as the

---

[6]Although the Court stated in *Lopez-Mendoza* that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as fruit of an unlawful arrest," 468 U.S. at 1039, this statement has been held to apply only to challenges to jurisdiction, not evidence.  *See Farias-Gonzales*, 556 F.3d at 1186 n.5 (noting that the Fourth, Eighth, Ninth, and Tenth Circuits have also held that *Lopez-Mendoza* addresses jurisdiction and not evidence).

defendant's fingerprints, is never suppressible in a criminal case.  507 F.3d at 227.  The Fourth

Circuit reversed the district court, finding: "When police officers use an illegal arrest as an

investigatory device in a criminal case 'for the purpose of obtaining fingerprints without a warrant

or probable cause,' then the fingerprints are inadmissible under the exclusionary rule as 'fruit of the

illegal detention.'" *Id.* at 231 (quoting *United States v. Olivares-Rangel*, 458 F.3d 1104, 1114-16)).

While it is true that the district court in *Oscar-Torres* had based its decision on a misinterpretation

of the "identity" statement in *Lopez-Mendoza*, 468 U.S. at 1039, and the Eleventh Circuit in *Farias-*

*Gonzales* purported to base its decision on the cost-benefit analysis discussed in *Hudson*, the Fourth

Circuit in *Oscar-Torres* could not have been clearer: "When law enforcement officers 'intend[] or

expect[]' that an arrest will lead to a criminal prosecution as well as (or instead of) a deportation

proceeding, then the 'exclusionary rule . . . continue[s] to apply' and *the fingerprints must be*

*suppressed*."  *Id.* (quoting *Lopez-Mendoza*, 468 U.S. at 1042-43)) (emphasis added).

Finally, *Farias-Gonzales*'s blanket rule "that the exclusionary rule does not apply to

evidence to establish the defendant's identity in a criminal prosecution" is inconsistent with

Supreme Court precedent holding that such evidence may be suppressed.  556 F.3d at 1189.  In both

*Hayes v. Florida*, 470 U.S. 811 (1985), and *Davis v. Mississippi*, 394 U.S. 721 (1969), the Court

held that detentions for the purpose of fingerprinting a criminal suspect must comply with the

strictures of the Fourth Amendment.  *Hayes*, 470 U.S. at 814 ("[D]etention for the purpose of

fingerprinting [is] subject to the constraints of the Fourth Amendment . . . ."); *Davis*, 394 U.S. at 727

("Detentions for the sole purpose of obtaining fingerprints are . . . subject to the constraints of the

Fourth Amendment.").  Because the fingerprints of each of the defendants in these two cases had

been improperly admitted into evidence, the Court reversed their convictions.  *Hayes*, 470 U.S. at 817-18; *Davis*, 394 U.S. at 728.

On the basis of one very recent, out-of-circuit case, *Farias-Gonzales*, the Government asks this Court to ignore binding Fourth Circuit and Supreme Court cases.  Tellingly, the Government makes no attempt to explain how *Farias-Gonzales*'s blanket holding may be reconciled with the precedent that this Court is bound to follow.  Absent some pronouncement to the contrary by the Fourth Circuit Court of Appeals or the United States Supreme Court, this Court cannot follow  the rule in *Farias-Gonzales* that identity evidence may not be suppressed because the social costs of doing so "are great while the deterrence benefits are minimal."  556 F.3d at 1189.  On the authority of  *Oscar-Torres, Hayes,* and *Davis*, such evidence, specifically fingerprints, may indeed be suppressed.  The appropriate inquiry is the administrative/investigative test articulated in *Oscar-Torres*.  507 F.3d at 230-31.

## B. Statement to Agent Beveridge

The Fourth Amendment also extends to confessions:

> It is settled law that "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint."

*Elstad v. United States*, 470 U.S. 298, 306 (1985) (quoting *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)) (other internal quotations omitted).  Applied to the Fourth Amendment, "[t]he exclusionary rule . . . serves interests and policies that are distinct from those it serves under the Fifth [Amendment]."  *Brown v. Illinois*, 422 U.S. 590,  601 (1975).  That is, the Fourth Amendment "is

directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits." *Id.* This distinction creates differing implications for *Miranda* warnings:

> In short, exclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.

*Id.* For this reason, the Fourth Amendment requires more than *Miranda* warnings:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Id.* at 603-04.

The Government and Defendant do not dispute that these factors should be applied to this case to determine the admissibility of Defendant's statement to Agent Beveridge. However, the parties disagree as to what the result of that application should be. While the Government argues that "it is clear that ICE Agent Beveridge's separately obtained statement obtained from defendant should be admissible," *Government's Post-Hearing Response*, at p. 26, Defendant maintains that "the taint of [Defendant's] illegal arrest had not sufficiently dissipated to permit admission of [his] statement to Agent Beveridge."[7] *Defendant's Post-Hearing Memorandum in Support*, at p. 22.

---

[7]Defendant also contends that Defendant's statement to Agent Beveridge is not admissible
(continued...)

-22-

It is agreed that Agent Beveridge administered *Miranda* warnings to Defendant prior to interrogating him. T. 74. This "important factor" counsels in favor of admission of Defendant's statement, although it is "not the only factor to be considered." *Brown*, 422 U.S. at 603. The Court must also look at the remaining three factors. *See id.* at 603-04.

In this case, Defendant was arrested on August 23, 2008, but Agent Beveridge did not obtain a statement from him until ten days later, on September 2, 2008. Thus, this case involved limited "temporal proximity [between] the arrest and the confession." *Id*. at 603. Generally speaking, this considerable interlude also counsels in favor of admission. *See United States v. Hernandez-Hernandez*, 384 F.3d 562, 564, 567 (8th Cir. 2004) (affirming district court's finding that taint of a statement to an immigration official had been purged, in part because of a five-day "lapse in time" between the beginning of the illegal detention and the statement). However, it is significant that in this case Defendant had previously made a similar statement to Agent DeQuiros admitting that he had illegally reentered the United States. *Compare Government Ex. 3* (doc. 39-4) *with Government Ex. 4* (doc. 39-5). Although the Government does not seek to introduce this statement, Defendant had no reason to know that this statement would not, and could not, be used against him. *See Brown*, 422 U.S. at 605 n.12 (noting "the fact that [the defendant] had made one statement, believed by him to be admissible, and his cooperation with the arresting and interrogating officers . . . , with his anticipation of leniency, bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination"). The Court believes that the potential effects

---

[7](...continued)
because he was arrested for a crime but did not receive prompt presentment before a judicial officer or a prompt determination of probable cause. In light of the Court's findings regarding the taint of Defendant's statement to Agent Beveridge, the Court declines to consider this alternative ground for exclusion.

of this prior statement strongly suggest limiting the weight accorded to the delay between Defendant's arrest and the statement made to Agent Beveridge.

Moreover, this delay must be viewed in conjunction with the lack of intervening circumstances during the period between the arrest and the statement at issue. Defendant remained detained for this entire period of time (and, indeed, is still detained). He was not taken before a judicial officer, nor was he appointed counsel. In fact, it appears that Defendant had no contact or communication with anyone during this period, other than his jailers. The Government argues that the administrative proceedings conducted by Agent DeQuiros served as an intervening event, but it is not likely that Defendant perceived any meaningful change in his circumstances. Agent DeQuiros, of course, is not a disinterested judicial officer. Rather, he was an employee of ICE, as is Agent Beveridge. There was nothing in the change of interrogators to signify to Defendant that he had entered some new phase of his detention in which he must tread carefully, lest he incriminate himself. Certainly, this proposed intervening circumstance is far less noteworthy than those occurring in cases in which dissipation has been found. *See Johnson v. Louisiana*, 406 U.S. 356, 365 (1972) (cited by *Brown*, 422 U.S. at 603-04, as an example of intervening circumstances, and noting that the defendant was represented by counsel and had been "brought before a community magistrate to advise him of his rights and set bail"); *Wong Sun*, 371 U.S. at 475-76 (noting that, during the period between the arrest and the statement, the defendant was arraigned and then released on his own recognizance, only to return later voluntarily to make a statement). Notwithstanding Agent DeQuiros's administrative processing, this case is one in which "there was no intervening event of significance whatsoever." *Brown*, 422 U.S. at 604.

Finally, the Court must consider, "particularly, the purpose and flagrancy of the official misconduct." *Id.* As explained earlier in this order, Defendant's arrest constituted an obvious violation of his Fourth Amendment rights. The Sheriff's Office was explicitly told by Agent DeQuiros that they lacked the authority to serve an administrative warrant against Defendant, that they should not attempt to do so, and that if they encountered Defendant, they should instead contact Agent DeQuiros, who would arrange for his arrest. T. 51-52. The Sheriff's Office ignored this instruction. Acting on the authority of an NCIC report that was "NOT A GOVERNMENT DETAINER," "FOR INFORMATIONAL PURPOSES ONLY," and that merely stated that Defendant "*MAY* BE AMENABLE TO ARREST," *Government Ex. 1* (doc. 39-2) (emphasis added), they entered Defendant's hotel room without consent or exigent circumstances and arrested him. At the hearing on this motion, Sgt. Westfall did not testify that he believed this document, the NCIC report, to be a warrant. T. 15. Nor did he contact ICE, which had faxed him the report, for clarification. Under these circumstances, "[t]he impropriety of the arrest was obvious; awareness of that fact [has been] virtually conceded by" the Government, who has never seriously contested that this arrest was unlawful. *Brown*, 422 U.S. at 605; *Government's Post-Hearing Response*, at p. 8.

The Sheriff's Office's conduct was wholly unlike that of law enforcement in *Ramos*, a case cited by the Government and finding dissipation. In that case, a state trooper pulled over a truck with an out-of-state license plate after he noticed that the truck's passenger was not wearing his seatbelt. *Ramos*, 42 F.3d at 1161. The trooper followed the truck to ensure that the man was not in fact wearing his seatbelt. *Id.* He then pulled the truck over. *Id.* The trooper checked the licenses of the driver and his passenger, which both came back clear. *Id.* He also each asked man,

individually, their destination and their reason for travel.  *Id.* at 1161-62.  Both stated that they were

going to Chicago to visit a sick cousin, although the driver said that he did not know to what section

of the city.[8]  *Id.*  The trooper then asked the driver, again out of the hearing of the passenger, whether

they had any guns or drugs because "it's a known fact that drugs and weapons are being transported

across the interstate."  *Id.* at 1162.  The driver responded no, and the trooper asked permission to

search the truck.  *Id.*

The trooper then produced a "Consent to Search" form that had been written in both English

and Spanish.  *Id.*  He advised the driver that he did not have to consent, although he also filled out

one side of the form and asked the driver to sign it, which he did.  *Id.*  In the subsequent search of

the truck, law enforcement found a gun, ammunition, and a large amount of marijuana.  *Id.*  After

being charged, the men filed a motion to suppress the results of the search on the grounds that "the

scope of questioning was not reasonably related to the circumstances that justified the stop."  *Id.*

(citing *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990), *cert. denied*, 502 U.S. 962

(1991)).

The district court found that the initial stop was valid because the passenger had not been

wearing his seatbelt.  *Id.*  Further, it found that the trooper's questions had not been intrusive and

that he had sufficient reason to ask the men if they were transporting guns or drugs and request

consent to search, because the truck had out-of-state license plates and the driver did not know to

what part of Chicago he was going.  *Id.*  For these reasons, "the [d]istrict court held that the officer

had a sufficient objective basis under *Terry v. Ohio*, 392 U.S. 1 (1968), to question [the driver]

---

[8]It appears that the trooper did not ask the passenger about the section of Chicago to which
they were traveling.

further." *Id.* at 1163.  The Eighth Circuit Court of Appeals "respectfully disagree[d] with this conclusion" and reversed.  *Id.* at 1163.  The court of appeals observed: "The [district] [c]ourt relied on the facts that the vehicle was on an interstate highway with out-of-state plates, and [the defendants] were not certain about the part of Chicago that was their destination. . . . All of these facts are consistent with innocent behavior." *Id.*  Continuing, however, the court acknowledged: "Of course, that is not in itself sufficient to negative the existence of reasonable articulable suspicion after *Terry*.  A trained officer may properly infer from a collection of circumstances, no one of which itself indicates illegal activity, that further inquiry is inappropriate." *Id.*  Although the court concluded its consideration of the trooper's conduct by reiterating that, "[i]n the present case, though, the collection of circumstances relied on is simply insufficient," *id.*, the Eighth Circuit's disagreement with the district court's findings only underscore the critical point.  The official misconduct in *Ramos* was not "flagran[t]," *Brown*, 422 U.S. at 604, and perhaps even the type about which reasonable minds might disagree.  Thus, this case is inapposite, and does nothing to convince the Court that Defendant's statement to Agent Beveridge should be admitted.  To the contrary, it further convinces the Court that Defendant's suppression motion must be granted.

**IV. CONCLUSION**

Pending before the Court is the Motion to Suppress of Defendant Mateo Diego Toledo (doc.

16).  For the foregoing reasons, the Court **GRANTS** the motion.

ENTER: May 11, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE